# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| JAMES SKODA, derivatively on behalf of KEYCORP, | Case No. |
| Plaintiff, | |
| vs. | |
| CHRISTOPHER M. GORMAN, ALEXANDER M. CUTLER, H. JAMES DALLAS, ELIZABETH R. GILE, RUTH ANN M. GILLIS, ROBIN N. HAYES, CARLTON L. HIGHSMITH, RICHARD J. HIPPLE, DEVINA A. RANKIN, BARBARA R. SNYDER, RICHARD J. TOBIN, TODD J. VASOS, and DAVID K. WILSON, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| KEYCORP, | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff James Skoda ("Plaintiff") by his undersigned attorneys, derivatively on behalf of Nominal Defendant KeyCorp (the "Company"), brings this Verified Shareholder Derivative Complaint against Christopher M. Gorman ("Gorman"), Alexander M. Cutler ("Cutler"), H. James Dallas ("Dallas"), Elizabeth R. Gile ("Gile"), Ruth Ann M. Gillis ("Gillis"), Robin N. Hayes ("Hayes"), Carlton L. Highsmith ("Highsmith"), Richard J. Hipple ("Hipple"), Devina A. Rankin ("Rankin"), Barbara R. Snyder ("Snyder") Richard J. Tobin ("Tobin"), Todd J. Vasos ("Vasos"), and David K. Wilson ("Wilson") (collectively, the "Individual Defendants" and together with KeyCorp, "Defendants"), for and among other things, their breaches of fiduciary duties and violations of the federal securities laws that resulted in material damage to KeyCorp and its stockholders.

Plaintiff alleges the following based upon personal knowledge with respect to Plaintiff and, as to all other matters, upon information and belief based upon the investigation and analysis by Plaintiff's counsel, including, among other things, a review of the Company's press releases and public filings with the United States Securities and Exchange Commission ("SEC"), corporate governance documents published on the Company's website, transcripts of KeyCorp conference calls with financial analysts and investors, news reports, financial analyst reports, and other publicly available information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought against the members of the KeyCorp's Board of Directors (the "Board") for their breaches of fiduciary duties and violations of the federal securities laws, as well as other misconduct, which caused substantial damage to the

1

Company and its shareholders.

2.        KeyCorp operates as the holding company for KeyBank National Association ("KeyBank"), one of the largest bank-based financial services companies in the United States with assets of approximately $195 billion. According to the Company's latest Annual Report on Form 10-K filed with the SEC on February 22, 2023 for the year ending December 31, 2022 (the "2022 10-K"), KeyCorp's earnings are "largely dependent" upon Net Interest Income ("NII"), *i.e.,* the difference between interest income earned on interest-earning assets such as loans and securities and interest expense paid on interest-bearing liabilities such as deposits and borrowed funds.

3.        In public filings, the Company repeatedly represented that it was actively managing its liquidity risks and maintaining an adequate liquid asset portfolio. However, in March 2023, the Company disclosed only a 1%-4% increase in NII, a key financial metric for the bank, versus the previous guidance of a 6%-9% increase announced less than two months earlier.

4.        Despite reassurances regarding the Company's liquidity position, on June 12, 2023, KeyCorp warned that its NII would likely drop by 12% in the second quarter despite previous guidance of a 4%-5% decrease for the quarter.  On the news of the unfavorable financial guidance, KeyCorp's stock price fell over 4% in one day, and more than 45% in under a month.

5.        The Individual Defendants' misconduct resulted in the Company, Defendant Gorman, and other officers being named as defendants in a federal securities class action lawsuit pending in the United States District Court for the Northern District of Ohio captioned *Gurevitch v. KeyCorp et al.*, No. 1:23-cv-01520-DCN (N.D. Ohio) (the "Securities Class Action"). This has further required KeyCorp to undertake internal investigations and to implement adequate internal controls which will cause the Company to expend significant sums of money.

6.        KeyCorp has been substantially damaged as a result of the Individual

Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

7.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, of the collective engagement in misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of Defendant Gorman's likely liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

7.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78n(a)(1)), SEC Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder, and under Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

8.     The Court has jurisdiction over each Defendant named herein because KeyCorp is incorporated, maintains its headquarters, and does substantial business in this District. As such, each Defendant is an individual or corporation who has sufficient minimum contacts with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9.     This action was not brought collusively to confer jurisdiction on a court of the United States that it would not otherwise have.

10.    Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C.

§ 78aa, and 28 U.S.C. § 1391(b), as the Company maintains its headquarters in the District and conducts substantial business in the District.

## PARTIES

11. Plaintiff is a current shareholder of KeyCorp and has continuously held at all relevant times.

12. Nominal Defendant KeyCorp is incorporated under the laws of Ohio with its principal executive offices located at 127 Public Square, Cleveland, Ohio 44114-1306. KeyCorp's common stock trade on the New York Stock Exchange ("NYSE") under the ticker symbol "KEY".

13. Defendant Gorman is the Chairman of the Board and Chief Executive Officer ("CEO") of KeyCorp. Gorman has been a director since 2019. Gorman has served in several leadership roles in his twenty-five years at the Company, including as KeyCorp's Chief Operating Officer and President of Banking. As of March 17, 2023, Gorman owns 975,775 KeyCorp shares. In 2022, Gorman received compensation totaling $10,463,627 from the Company.

14. Defendant Cutler has been a KeyCorp director since 2000 and is Chair of the Nominating and Corporate Governance Committee and a member of the Compensation and Organization Committee and the Executive Committee. As of March 17, 2023, Cutler owns 252,553 KeyCorp shares. In 2022, Cutler received compensation totaling $294,991 from the Company.

15. Defendant Dallas has been a KeyCorp director since 2005 and is Chair of the Technology Committee and a member of the Audit Committee and the Nominating and Corporate Governance Committee. As of March 17, 2023, Dallas owns 115,172 KeyCorp shares. In 2022, Dallas received compensation totaling $269,991 from the Company.

16. Defendant Gile has been a KeyCorp director since 2010 and is Chair of the Risk

Committee and a member of the Nominating and Corporate Governance Committee. As of March 17, 2023, Gile owns 36,767 KeyCorp shares. In 2022, Gile received compensation totaling $269,991 from the Company.

17. Defendant Gillis has been a KeyCorp director since 2009 and is a member of the Audit Committee and the Technology Committee. As of March 17, 2023, Gillis owns 168,361 KeyCorp shares. In 2022, Gillis received compensation totaling $244,991 from the Company.

18. Defendant Hayes has been a KeyCorp director since 2020 and is a member of the Risk Committee and the Technology Committee. As of March 17, 2023, Hayes owns 9,074 KeyCorp shares. In 2022, Hayes received compensation totaling $244,991 from the Company.

19. Defendant Highsmith has been a KeyCorp director since 2016 and is a member of the Risk Committee and the Nominating and Corporate Governance Committee. As of March 17, 2023, Highsmith owns 64,139 KeyCorp shares. In 2022, Highsmith received compensation totaling $244,991 from the Company.

20. Defendant Hipple has been a KeyCorp director since 2012 and is Chair of the Audit Committee and a member of the Nominating and Corporate Governance Committee and Executive Committee. As of March 17, 2023, Hipple owns 66,174 KeyCorp shares. In 2022, Hipple received compensation totaling $269,991 from the Company.

21. Defendant Rankin has been a KeyCorp director since 2020 and is a member of the Audit Committee and the Technology Committee. In 2022, Rankin received compensation totaling $244,991 from the Company.

22. Defendant Snyder has been a KeyCorp director since 2010 and is Chair of the Compensation and Organization Committee and a member of the Nominating and Corporate Governance Committee and the Executive Committee. As of March 17, 2023, Snyder owns

20,602 KeyCorp shares. In 2022, Snyder received compensation totaling $254,991 from the Company.

23.     Defendant Tobin has been a KeyCorp director since 2021 and is a member of the Compensation and Organization Committee and the Technology Committee. In 2022, Tobin received compensation totaling $229,991 from the Company.

24.     Defendant Vasos has been a KeyCorp director since 2020 and is a member of the Compensation and Organization Committee and the Technology Committee.  As of March 17, 2023, Vasos owns 8,000 KeyCorp shares. In 2022, Vasos received compensation totaling $229,991 from the Company.

25.     Defendant Wilson has been a KeyCorp director since 2014 and is a member of the Risk Committee.  As of March 17, 2023, Wilson owns 32,558 KeyCorp shares. In 2022, Wilson received compensation totaling $244,991 from the Company.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

26.     By reason of their positions as officers or directors of KeyCorp and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owe KeyCorp and its shareholders, fiduciary obligations of loyalty, good faith, due care, and candor, and were and are required to use their utmost ability to control, manage, and oversee KeyCorp in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of KeyCorp and its shareholders to benefit all shareholders equally and not in furtherance of their own personal interests or benefit.

27.     The Individual Defendants, because of their positions of control and authority as directors and officers of KeyCorp, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

6

28.     As officers and directors of a publicly traded company whose common stock was registered with the SEC and traded on the NYSE, the Individual Defendants also owed a duty to ensure the dissemination of accurate, complete, and truthful information concerning KeyCorp's financial condition, operations, products, internal controls, and business prospects. In addition, the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all material facts so that the market price of the Company's shares would be based upon accurate information. In order to meet these duties, the Individual Defendants were required to exercise reasonable control and supervision over KeyCorp's management, policies, and internal controls.

29.     At all times relevant hereto, the Individual Defendants were the agents of each other and KeyCorp and were always acting within the course and scope of such agency.

30.     The Individual Defendants were and are also subject to particularized duties pursuant to specific policies in effect at KeyCorp.

**KEYCORP'S CODE OF BUSINESS CONDUCT AND ETHICS**

31.     KeyCorp's Code of Business Conduct and Ethics ("Code of Conduct") applies to all KeyCorp employees and its Board.

32.     The Code of Conduct includes an introduction where Defendant Gorman stressed the importance of acting with exemplary professional and ethical standards, stating in part: "We all have a responsibility to make good choices and to act according to the highest professional and ethical standards in everything we do."

33.     The Code of Conduct requires the reporting of any violation of the Code of Conduct, stating in part:

> As a Key employee or member of Key's Board of Directors, you are obligated to both comply with the Code and to speak up when you suspect or witness

7

a potential violation of the Code. Failure to report violations may lead to disciplinary action, including termination of your employment and legal action.

So when something doesn't seem right, you are responsible—and accountable—to speak up.

34. The Code of Conduct requires compliance with the Code of Conduct as part of KeyCorp's risk management program.

35. The Code of Conduct requires that "employees and members of the KeyCorp Board of Directors" assist the Company with adherence to all applicable laws and regulations, including applicable securities laws:

> We expect our employees and members of the KeyCorp Board of Directors to help us adhere to all applicable laws and regulations. We are obligated to comply with all applicable country, federal, state, and local laws, rules, and regulations. This includes all applicable securities laws and regulations, accounting standards, accounting controls, and auditing practices.

36. The Code of Conduct requires full and fair disclosure in all reports, documents, and public communications, stating in part: "You are required to make full, fair, accurate, timely, and understandable disclosure in reports and documents that Key[Corp] files with or submits to regulatory agencies, and in other public communications made by Key[Corp]."

37. The Code of Conduct also stresses the development and maintenance of internal accounting controls, stating in part:

> Key is required by law to develop and maintain systems of internal accounting controls. Each of us has a responsibility for ensuring that all of Key's financial and business records meet the highest standards of accuracy and completeness. We provide accurate information about Key's business in a timely and complete manner. We must ensure that the preparation of financial statements, reports, and accounts is in accordance with all applicable laws, rules, and accounting principles.

38. The Code of Conduct requires the reporting of "questionable accounting or auditing matters" directly to the Audit Committee.

## KEYCORP'S AUDIT COMMITTEE CHARTER

39.     The Audit Committee Charter sets forth additional duties for members of the Audit Committee and provides that members are obligated to assist the Board in its oversight of, among other things, internal audit, financial reporting and legal matters; the integrity of the Company's financial statements; and the Company's compliance with legal and regulatory requirements.

40.     The Audit Committee members are required to, among other things:

• Meet with management and the independent auditors to discuss and review the Corporation's quarterly financial statements including reviewing specific disclosures made in management's discussion and analysis;

• Discuss generally with management the Corporation's earnings press releases as well as financial information and earnings guidance, if any, provided to analysts and rating agencies;

• Review with the Corporation's General Counsel legal matters that may have a material impact on the financial statements and review with the Chief Risk Officer or his or her designee and the General Counsel, as appropriate, any material reports or inquiries received from regulators or government agencies raising significant issues as to compliance with applicable laws;

• Meet with management and, in particular, the Chief Risk Review Officer and General Auditor, to discuss the process by which risk review is undertaken. Additionally, this Committee shall have responsibility over all risk review functions (including internal audit), financial reporting, legal matters, and fraud risk. Further, the Committee shall consider matters pertaining to significant risk issues interwoven with or otherwise arising out of other risks and matters within the Committee's jurisdiction;

• Review and approve "significant" policies (as defined in KeyCorp's Policy Governance Policy) relating to the risk areas overseen by the Committee;

• With the Risk Committee, (i) review and provide oversight of the Corporation's methodology for setting the allowance for loan and lease losses to insure that it appropriately reflects risk in the portfolio; (ii) review trends relating to non- performing assets and charge-offs, and determinations made by management about the appropriate level and adequacy of the allowance for loan and lease losses; (iii) ensure maintenance by management of appropriate documentation that will provide transparency into model precision adjustments and (iv) oversee and monitor operational risk, subject to the Risk Committee's final responsibility for operational risk oversight; and

• Receive reports on enterprise risk (including compliance risk).

## KEYCORP'S RISK COMMITTEE CHARTER

41.　　　The Risk Committee Charter sets forth additional duties for members of the Risk Committee and provides that members are "responsible strategies, policies, procedures and practices relating to the assessment and management of the Corporation's enterprise-wide risk, including risks related to capital adequacy, capital planning, and capital actions."

42.　　　The Risk Committee members are required to, among other things:

- Review, at least annually, the Corporation's Enterprise Risk Management ("ERM") Policy, which includes the Corporation's Risk Appetite Statement, and recommend the ERM Policy to the Board for its approval;

- Receive and review periodic reports to monitor such risks in relation to the Corporation's risk appetite and risk tolerances, including the overall liquidity position of the Corporation and liquidity management and funding strategies to assure consistency with the Corporation's strategic plans;

- In consultation with the Audit Committee, (i) review management's methodology for setting the allowance for loan and lease losses, and evaluating changes to the methodology to ensure that it appropriately reflects risk in the portfolio, (ii) review trends relating to non-performing assets and charge-offs, and determinations made by management about the appropriate level and adequacy of the allowance for loan and lease losses, (iii) ensure appropriate documentation is maintained by management to provide transparency into model precision adjustments, and (iv) oversee and monitor operational risk, with the Risk Committee retaining final responsibility for operational risk, including review and approval of significant operational risk policies;

- Periodically review with management the strategies, policies, procedures and practices that govern the process for assessing and managing risks identified in the ERM Policy in the context of the Corporation's structure, risk profile, complexity, activities and size;

- Receive and review periodic reports from the Corporation's Chief Risk Officer regarding the monitoring and control of risk exposure including top and emerging regulatory and industry risks;

- Review and approve, or recommend for approval to the Board as applicable, significant policies relating to risk management;

- Review and monitor significant regulatory examination or supervisory findings and the status of the Corporation's efforts to remediate or remedy any deficiencies; and

- Receive and review periodic reports to monitor risks relating to capital management and related risk matters in relation to the Corporation's risk appetite and risk tolerances.

## KEYCORP'S NOMINATING AND CORPORATE GOVERNANCE COMMITTEE CHARTER

43.     The Charter of the Nominating and Corporate Governance Committee sets forth additional duties for its members, including obligations relating to overseeing the development and adequacy of the Corporate Governance Guidelines including, annually reviewing and recommending to the Board changes, if any in the Corporate Governance Guidelines.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

44.     On February 26, 2020, the Company filed its Annual Report on Form 10-K with the SEC for the year ended December 31, 2019 (the "2019 10-K"). The 2019 10-K was signed by Defendants Gorman, Cutler, Gile, Gillis, Highsmith, Hipple, Snyder and Wilson.

45.     The 2019 10-K stated the materials risks in connection with KeyCorp meeting the liquidity standards imposed by regulators, stating in part:

> The Federal Reserve's capital standards require Key to maintain more and higher quality capital and could limit our business activities (including lending) and our ability to expand organically or through acquisitions. They could also result in our taking steps to increase our capital that may be dilutive to shareholders or limit our ability to pay dividends or otherwise return capital to shareholders.

> In addition, the liquidity standards require us to hold high-quality liquid assets, may require us to change our future mix of investment alternatives, and may impact future business relationships with certain customers. Additionally, support of liquidity standards may be satisfied through the use of term wholesale borrowings, which tend to have a higher cost than that of traditional core deposits.

46.     The 2019 10-K also acknowledged the materials risks in connection with the impact of liquidity levels on access to and cost of funding, stating in part:

> [A] substantial, unexpected, or prolonged change in the level or cost of liquidity could have a material adverse effect on us. If the cost effectiveness or the availability of supply in these credit markets is reduced for a prolonged period of time, our funding needs may require us to access funding and manage liquidity by other means. These alternatives may include generating client deposits, securitizing or selling loans, extending the maturity of wholesale borrowings, borrowing under certain secured borrowing arrangements, using relationships developed with a variety of fixed income investors, and further managing loan growth and

11

investment opportunities. These alternative means of funding may result in an increase to the overall cost of funds and may not be available under stressed conditions, which would cause us to liquidate a portion of our liquid asset portfolio to meet any funding needs.

47.     The 2019 10-K also discussed the importance of managing liquidity risk, stating in part:

> Liquidity risk, which is inherent in the banking industry, is measured by our ability to accommodate liability maturities and deposit withdrawals, meet contractual obligations, and fund new business opportunities at a reasonable cost, in a timely manner, and without adverse consequences. Liquidity management involves maintaining sufficient and diverse sources of funding to accommodate planned, as well as unanticipated, changes in assets and liabilities under both normal and adverse conditions.

48.     All subsequent Quarterly Reports and Annual Reports throughout 2020, 2021, and 2022, including the Company's Annual Report on Form 10-K filed with the SEC on February 22, 2022, for the period ended December 31, 2021 ("2021 10-K"), which was signed by all of the Individual Defendants, contained similar statements acknowledging the risks in connection with managing liquidity levels and the related costs.

49.     On January 23, 2020, the Company filed a Current Report on Form 8-K attaching a press release announcing the fourth quarter and full year 2019 financial results, including net income of $439 million for the fourth quarter of 2019, compared to $383 million in the previous quarter. KeyCorp also reported overall taxable-equivalent NII of $987 million for the fourth quarter of 2019, compared to $1.0 billion for the fourth quarter of 2018. In particular, in the consumer bank segment, the press release stated that: "Taxable equivalent net interest income decreased by $12 million, or 2.0%, from the fourth quarter of 2018, with balance sheet growth offset by lower purchase accounting accretion and change in deposit mix." The Company reported that "[t]he decrease in net interest income reflects a lower net interest margin" which was "impacted by a lag in deposit pricing as interest rates moved lower."

50.     In the press release, KeyCorp's current CEO Beth Mooney ("Mooney") touted KeyCorp's "seventh consecutive year of positive operating leverage, supported by solid balance sheet growth, continued momentum in our fee-based businesses and strong expense control." Mooney also noted KeyCorp's top priorities of "[s]trong risk management and being disciplined with our capital."

51.     Also on January 23, 2020, the Company held a conference call with financial analysts and investors to discuss the Company's financial results. On the call, Chief Financial Officer ("CFO") Donald Kimble ("Kimble") represented that the Company was managing its liquidity position and had ample liquidity reserves, stating in part: "So we've got a lot of room to move that liquidity position down and remix into more loans. And so that's why we feel comfortable with our guidance as far as relatively stable margin and could have some potential upside if that liquidity level gets absorbed quicker than what our forecast would suggest."

52.     CEO Mooney commented on KeyCorp's "moderate risk profile," "strong credit underwriting," and "strong capital position" continuing that: "We believe that our steadfast commitment to maintaining our moderate risk profile and strong credit underwriting will continue to serve us well. And we have continued to maintain a strong capital position while returning a significant amount of our capital to our shareholders through dividends and share repurchases."

53.     Defendant Gorman, at that time KeyCorp's President and Chief Operating Officer, discussed the importance of maintaining the Company's risk profile and capital position, stating in part:

> [T]here is nothing more important than maintaining our moderate risk profile. This is an area where we underperformed through the last downturn, and we are committed to outperform through the next business cycle. And finally, we will be disciplined with our capital. As you've probably heard me say, we are focused on the return on and the return of capital.

13

54.     In the 2019 10-K, Defendants Gorman, Cutler, Gile, Gillis, Highsmith, Hipple, Snyder, and Wilson represented that the Company had a more than sufficient liquid asset portfolio to manage through an adverse liquidity event, stating in part:

> Over the past 12 months, our liquid asset portfolio, which includes overnight and short-term investments, as well as unencumbered, high quality liquid securities held as protection against a range of potential liquidity stress scenarios, has increased as a result of an increase in unpledged securities, partially offset by lower balances held at the Federal Reserve. ***The liquid asset portfolio continues to exceed the amount that we estimate would be necessary to manage through an adverse liquidity event by providing sufficient time to develop and execute a longer-term solution.***[1]

55.     The 2019 10-K discussed that the Board, and other relevant committees and officers were actively managing its liquidity risk, stating in part:

> The management of consolidated liquidity risk is centralized within Corporate Treasury. Oversight and governance is provided by the Board, the ERM Committee, the ALCO, and the Chief Risk Officer. The Asset Liability Management Policy provides the framework for the oversight and management of liquidity risk and is administered by the ALCO. The Corporate Treasury Oversight group within the MRM, as the second line of defense, provides additional oversight. Our current liquidity risk management practices are in compliance with the Federal Reserve Board's Enhanced Prudential Standards.
>
> These committees regularly review liquidity and funding summaries, liquidity trends, peer comparisons, variance analyses, liquidity projections, hypothetical funding erosion stress tests, and goal tracking reports. The reviews generate a discussion of positions, trends, and directives on liquidity risk and shape a number of our decisions. When liquidity pressure is elevated, positions are monitored more closely and reporting is more intensive. To ensure that emerging issues are identified, we also communicate with individuals inside and outside of the company on a daily basis.

56.     The 2019 10-K discussed that the Company was managing liquidity risk exposure, stating in part:

> Most of our liquidity risk is derived from our lending activities, which inherently places funds into illiquid assets. Liquidity risk is also derived from our deposit gathering activities and the ability of our customers to withdraw funds that do not have a stated maturity or to withdraw funds before their contractual maturity.

---

[1] All emphasis added, unless otherwise noted.

The assessments of liquidity risk are measured under the assumption of normal operating conditions as well as under a stressed environment. We manage these exposures in accordance with our risk appetite, and within Board-approved policy limits.

57.     The 2019 10-K discussed that the Company was monitoring its liquidity position and funding sources, stating in part:

We regularly monitor our liquidity position and funding sources and measure our capacity to obtain funds in a variety of hypothetical scenarios in an effort to maintain an appropriate mix of available and affordable funding. In the normal course of business, we perform a monthly hypothetical funding erosion stress test for both KeyCorp and KeyBank. In a "heightened monitoring mode," we may conduct the hypothetical funding erosion stress tests more frequently, and use assumptions to reflect the changed market environment. Our testing incorporates estimates for loan and deposit lives based on our historical studies. Erosion stress tests analyze potential liquidity scenarios under various funding constraints and time periods. Ultimately, they determine the periodic effects that major direct and indirect events would have on our access to funding markets and our ability to fund our normal operations. To compensate for the effect of these assumed liquidity pressures, we consider alternative sources of liquidity and maturities over different time periods to project how funding needs would be managed.

58.     The 2019 10-K stated that KeyCorp had a Contingency Funding Plan in place to address a liquidity crisis, stating in part:

We maintain a Contingency Funding Plan that outlines the process for addressing a liquidity crisis. The plan provides for an evaluation of funding sources under various market conditions. It also assigns specific roles and responsibilities for managing liquidity through a problem period. As part of the plan, we maintain on- balance sheet liquid reserves referred to as our liquid asset portfolio, which consists of high quality liquid assets. During a problem period, that reserve could be used as a source of funding to provide time to develop and execute a longer-term strategy.

59.     The 2019 10-K discussed that the Company had a substantial liquid asset portfolio of $25.2 billion, stating in part:

The liquid asset portfolio at December 31, 2019, totaled $25.2 billion, consisting of $24.0 billion of unpledged securities, $140 million of securities available for secured funding at the FHLB, and $1.1 billion of net balances of federal funds sold and balances in our Federal Reserve account. The liquid asset portfolio can fluctuate due to excess liquidity, heightened risk, or prefunding of expected outflows, such as debt maturities.

60.     The 2019 10-K outlined KeyCorp's long-term liquidity strategy, stating in part:

Our long-term liquidity strategy is to be predominantly funded by core deposits. However, we may use wholesale funds to sustain an adequate liquid asset portfolio, meet daily cash demands, and allow management flexibility to execute business initiatives. Key's client-based relationship strategy provides for a strong core deposit base that, in conjunction with intermediate and long-term wholesale funds managed to a diversified maturity structure and investor base, supports our liquidity risk management strategies. We use the loan-to-deposit ratio as a metric to monitor these strategies. Our target loan-to-deposit ratio is 90-100% . . . which we calculate as the sum of total loans, loans held for sale, and nonsecuritized discontinued loans divided by deposits.

61.     On May 4, 2020, the Company filed its Quarterly Report on Form 10-Q for the period ended March 31, 2020 (the "1Q20 10-Q"). Attached to the 1Q20 10-Q was a certification pursuant to the Sarbanes Oxley Act of 2002 ("SOX") signed by Defendant Gorman certifying that the 1Q20 10-Q fully complied with the requirements of Section 13(a) or 15(d) of the Exchange Act and that the information contained in the 1Q20 10-Q fairly presented, in all material respects, the financial condition and results of operations of the Company. All subsequent Quarterly Reports contained signed SOX certifications by Defendant Gorman.

62.     In the 1Q20 10-Q, KeyCorp represented that it had a substantial liquid asset portfolio of $26 billion, stating in part:

Our primary source of funding for KeyBank is retail and commercial deposits. As of March 31, 2020, our consolidated loan-to-deposit ratio was 92%. In addition, we also have access to various sources of wholesale funding, maintain a portfolio of liquid assets, and have borrowing capacity at the FHLB and Federal Reserve Bank of Cleveland. Our liquid asset portfolio at March 31, 2020, totaled $26.0 billion, consisting of $22.1 billion of unpledged securities, $119 million of securities available for secured funding at the FHLB, and $3.8 billion of net balances of federal funds sold and balances in our Federal Reserve account. Additionally, as of March 31, 2020, our unused borrowing capacity secured by loan collateral was $24.9 billion at the Federal Reserve Bank of Cleveland and $5.8 billion at the FHLB. During the first quarter of 2020, our secured term borrowings increased $4.5 billion.

63.     In the 1Q20 10-Q, KeyCorp represented that it had conducted stress tests which

demonstrated the ability of KeyCorp to remain well capitalized even during of times of economic

and financial distress, stating in part:

> Capital and liquidity were clear strengths for us during the first quarter of 2020. We have participated in several rounds of government-mandated stress tests since the 2007-2009 financial crisis. These tests have shown that we would **_remain well capitalized_** through periods of severe economic and financial stress while continuing to support our clients and the communities in which we operate.

64.     In the 1Q20 10-Q, KeyCorp represented that it conducted regular stress tests and

sensitivity analyses to assess risk, stating in part:

> We also perform regular stress tests and sensitivity analyses on the model inputs that could materially change the resulting risk assessments. Assessments are performed using different shapes of the yield curve, including steepening or flattening of the yield curve, immediate changes in market interest rates, and changes in the relationship of money market interest rates. Assessments are also performed on changes to the following assumptions: loan and deposit balances, the pricing of deposits without contractual maturities, changes in lending spreads, prepayments on loans and securities, investment, funding and hedging activities, and liquidity and capital management strategies.

65.     In the 1Q20 10-Q, KeyCorp represented that it had a sufficient liquid asset

portfolio to manage through an adverse liquidity event, stating in part:

> Over the past quarter, our liquid asset portfolio, which includes overnight and short- term investments, as well as unencumbered, high quality liquid securities held as protection against a range of potential liquidity stress scenarios, has increased as a result of an increase cash held at the Federal Reserve, which was partially offset by a decrease in unpledged securities. The liquid asset portfolio continues to exceed the amount that we estimate would be necessary to manage through an adverse liquidity event by providing sufficient time to develop and execute a longer-term solution.

66.     In the 1Q20 10-Q, KeyCorp further stated that it had a strong liquidity position,

stating in part: "Our liquidity position at March 31, 2020, remained strong with a combined $50

billion in liquid assets and unused borrowing capacity."

67.     The Company represented that the Board, the Risk Committee of the Board, and

other relevant committees engaged in vigorous risk oversight over matters affecting liquidity,

stating in part:

> The management of nontrading market risk is centralized within Corporate Treasury. The Risk Committee of our Board provides oversight of nontrading market risk. The ERM Committee and the ALCO review reports on the interest rate risk exposures described above. In addition, the ALCO reviews reports on stress tests and sensitivity analyses related to interest rate risk. The ERM Committee and the ALCO have various responsibilities related to managing nontrading market risk, including recommending, approving, and monitoring strategies that maintain risk positions within approved tolerance ranges. The A/LM policy provides the framework for the oversight and management of interest rate risk and is administered by the ALCO. The MRM, as the second line of defense, provides additional oversight.

*        *        *

> We manage credit risk exposure through a multifaceted program. The Credit Risk Committee approves management credit policies ***and recommends for approval significant credit policies to the appropriate Board committee or to the Board***. These policies are communicated throughout the organization to foster a consistent approach to granting credit. There have been no significant changes in our Credit Risk Management practices as described under the heading "Credit risk management" beginning on page 74 of our 2019 Form 10-K.

68.     On August 3, 2020, the Company filed its Quarterly Report on Form 10-Q for the period ended June 30, 2020 (the "2Q20 10-Q"). The 2Q20 10-Q contained similar representations as the 1Q20 10-Q regarding the sufficiency of KeyCorp's liquid asset portfolio to manage adverse events, the Company's strong liquidity position, the regular stress tests and sensitivity analyses conducted by KeyCorp, and the oversight of the Risk Committee.

69.     On November 3, 2020, the Company filed its Quarterly Report on Form 10-Q for the period ended September 30, 2020 (the "3Q20 10-Q"). The 3Q20 10-Q contained similar representations to the 1Q20 10-Q and 2Q20 10-Q regarding the sufficiency of the Company's liquid asset portfolio to manage adverse events, the Company's strong liquidity position, the regular stress tests and sensitivity analyses conducted by KeyCorp, and the oversight of the Risk Committee.

70.     On February 22, 2021, KeyCorp filed its Annual Report on Form 10- K  (the "2020 10-K") with the SEC. The 2020 10-K was signed by Defendants Gorman, Cutler, Dallas, Gile, Gillis, Hayes, Highsmith, Hipple, Ranken, Snyder, Vasos, and Wilson. Attached to the 2020 10-K was a signed SOX certification by Defendant Gorman attesting that the 2020 10-K fully complied with the requirements of Section 13(a) or 15(d) of the Exchange Act and that the information contained in the 2020 10-K fairly presented, in all material respects, the financial condition and results of operations of KeyCorp.

71.     The 2020 10-K contained similar representations to the 2019 10-K regarding the Company's management of its liquidity risks, its Contingency Funding Plan, and the monitoring of its liquidity position and funding sources. The 2020 10-K further represented that KeyCorp had a substantial liquid asset portfolio of $36.6 billion, stating in part: "The liquid asset portfolio at December 31, 2020, totaled $36.6 billion, consisting of $21.1 billion of unpledged securities, $66.9 million of securities available for secured funding at the FHLB, and $15.4 billion of net balances of federal funds sold and balances in our Federal Reserve account."

72.     On May 4, 2021, the Company filed its Quarterly Report on Form 10-Q for the period ended March 31, 2021 (the "1Q21 10-Q"). The 1Q21 10-Q contained similar representations to the previous Quarterly Reports regarding the sufficiency of the Company's liquid asset portfolio to manage adverse events, the Company's strong liquidity position, the regular stress tests and sensitivity analyses conducted by KeyCorp, and the vigorous risk oversight over liquidity matters.

73.     On August 2, 2021, the Company filed with the SEC its Quarterly Report on Form 10-Q for the period ended June 30, 2021 (the "2Q21 10-Q"). The 2Q21 10-Q contained similar representations to the previous Quarterly Reports regarding the sufficiency of the

Company's liquid asset portfolio to manage adverse events, the Company's strong liquidity position, the regular stress tests and sensitivity analyses conducted by KeyCorp, and the vigorous risk oversight over liquidity matters.

74.     On November 2, 2021, the Company filed its Quarterly Report on Form 10-Q for the period ended September 30, 2021 (the "3Q21 10-Q"). The 3Q21 10-Q contained similar representations to the previous Quarterly Reports regarding the sufficiency of KeyCorp's liquid asset portfolio to manage adverse events, the Company's strong liquidity position, the regular stress tests and sensitivity analyses conducted by KeyCorp, and the vigorous risk oversight over liquidity matters.

75.     On January 20, 2022, the Company filed a Current Report on Form 8-K attaching a press release announcing the fourth quarter and fully year 2021 financial results, including net income of $601 million, for the fourth quarter of 2021 compared to $616 million in the previous quarter. KeyCorp also reported taxable-equivalent NII of $1.0 billion for the fourth quarter of 2021, a $5 million decrease from the same period the previous year and the net interest margin decreased by 26 basis points. The Company reported that the decreases "reflected the impact of lower reinvestment yields and the exit of the indirect auto loan portfolio, largely offset by a favorable earning asset mix." The press release also stated: "The net interest margin was also impacted by elevated levels of liquidity as we continued to experience higher levels of deposit inflows in 2021." In the consumer bank segment, "[t]axable-equivalent net interest income decreased by $69 million, compared to the fourth quarter of 2020, related to the sale of the indirect auto portfolio, partially offset by strong consumer mortgage balance sheet growth and fees related to PPP loans."

76.     In the press release, Defendant Gorman stated that KeyCorp's "collective focus

on sound, profitable growth" was "evidenced by our strong credit quality." Gorman also touted KeyCorp's commitment to "our capital priorities and maximizing shareholder value."

77.     Also on January 20, 2022, in a conference call with financial analysts and investors to discuss the fourth quarter 2021 and full year financial results, Defendant Gorman discussed that KeyCorp was focused on maintaining risk discipline, stating in part:

> Foundational to our model is a relentless focus on maintaining our risk discipline. Credit quality remains strong throughout the year, as net charge-offs as a percentage of average loans remained at historically low levels….We will continue to support our clients while maintaining our moderate risk profile, which has and will continue to position the company to perform well through all business cycles.

78.     CFO Kimble represented that the Company benefited from investing its excess liquidity position: "Couple of areas of interest in the past have been the impact of the repricing of our interest rate swap portfolio and the potential benefit from investing our excess liquidity position…. Also, if we reinvested the $20 billion of liquidity, our benefit to net interest income would be about $350 million a year." CFO Kimble further represented that the Company would be in a "strong position" even after investing the excess liquidity: "And so that will use up some of that excess liquidity in 2022, [but we will] still be in a strong position after that."

79.     Defendant Gorman emphasized that the Company was committed to providing liquidity for its customers: "So some of the extreme volatility that one might expect to see from trading, one, we don't have it as part of our business. *We trade just to provide liquidity for our customers*."

80.     On February 22, 2022, the Company filed the 2021 10-K with the SEC. The 2021 10-K was signed by all the Individual Defendants. The 2021 10-K contained similar representations to the 2019 10-K and 2020 10-K regarding the Company's management of its liquidity risks, its Contingency Funding Plan, and the monitoring of its liquidity position and

funding sources. The 2021 10-K stated that KeyCorp's liquid asset portfolio was $46.2 billion: "The liquid asset portfolio at December 31, 2021, totaled $46.2 billion, consisting of $35.9 billion of unpledged securities, $21 million of securities available for secured funding at the FHLB, and $10.2 billion of net balances of federal funds sold and balances in our Federal Reserve account."

81.     On May 4, 2022, the Company filed its Quarterly Report on Form 10- Q for the period ended March 31, 2022 (the "1Q22 10-Q"). The 1Q22 10-Q contained similar representations to the previous Quarterly Reports regarding the sufficiency of the Company's liquid asset portfolio to manage adverse events, the Company's strong liquidity position, the regular stress tests and sensitivity analyses conducted by KeyCorp, and the vigorous risk oversight over liquidity matters.

82.     On August 2, 2022, the Company filed its Quarterly Report on Form 10-Q for the period ended June 30, 2022 (the "2Q22 10-Q"). The 2Q22 10-Q contained similar representations to the previous Quarterly Reports regarding the sufficiency of the Company's liquid asset portfolio to manage adverse events, the Company's strong liquidity position, the regular stress tests and sensitivity analyses conducted by KeyCorp, and the vigorous risk oversight over liquidity matters.

83.     On November 1, 2022, the Company filed its Quarterly Report on Form 10-Q for the period ended September 30, 2022 (the "3Q22 10-Q"). The 3Q22 10-Q contained similar representations to the previous Quarterly Reports regarding the sufficiency of the Company's liquid asset portfolio to manage adverse events, the Company's strong liquidity position, the regular stress tests and sensitivity analyses conducted by KeyCorp, and the vigorous risk oversight over liquidity matters.

84.     On January 19, 2023, KeyCorp displayed the Company's fourth quarter and full

year fiscal 2022 financial results in an earnings webcast (the "2022 financial presentation"). In the 2022 financial presentation, KeyCorp forecasted that the NII for full year 2023 would be up "6%-9%" from the previous year. The Company represented that the Company had "Future [NII] Drivers" including "Organic Growth" stemming from the Company's focus "on relationship banking" which was "expected to drive continued loan growth and relatively stable deposits." The Company further represented that the Company's asset and liability management was positioned to grow NII "over the next two years, as swaps and short-term Treasuries mature" and the Company's investment portfolio was positioned to "***provide liquidity and enhance returns*** while benefiting from higher reinvestment rates."

85.    KeyCorp also noted that adverse impacts on NII such as marginal funding costs were only transitory as they were merely "increasing with rising interests rates," and emphasized that "[d]eposit costs are expected to increase as we remain competitive with the industry."

86.    On January 19, 2023, the Company filed a Current Report on Form 8-K attaching a press release announcing the fourth quarter and full year 2022 financial results, including net income of only $356 million for the fourth quarter of 2022 compared to $513 million for the previous quarter and $601 million in the fourth quarter of 2021. The Company also reported NII of $1.2 billion for the fourth quarter of 2022, an increase of $189 million from the fourth quarter of 2021. The net interest margin increased by 29 basis points. The press release stated in part:

> Net interest income and net interest margin benefited from higher earning asset balances and higher interest rates" but NII and the net interest margin "were negatively impacted by higher interest-bearing deposit costs and lower loan fees from the Paycheck Protection Program." Defendant Gorman stated: "Looking forward, we will continue to unlock the value of our differentiated business model by delivering revenue growth while maintaining our expense discipline." CEO Gorman focused on KeyCorp's "credit quality" which remained "strong with net-charge offs to average loans near historically low levels." Gorman represented: "Our results include a significant build in our allowance for credit losses, primarily reflecting a change in our economic outlook.

87. Also on January 19, 2023, during a conference call with financial analysts and investors to discuss the Company's financial results for the fourth quarter and full year 2021, CFO Kimble repeated the Company's expectation of a 6%-9% rise in NII and backed up the guidance with more detail:

> [NII] is expected to be up between 6% and 9% reflecting growth in average loan balances and higher interest rates. Our guidance is based on the forward curve, assuming a Fed funds rate peaking at 5% in the first quarter and starting to decline in the fourth quarter. These interest rate assumptions, along with our expectations for customer behavior and the competitive pricing environment are very fluid and will continue to impact our outlook prospectively.

88. Defendant Gorman represented on the conference call  that the Company was maintaining a moderate risk profile, stating in part: "Nonperforming loans declined again this quarter and delinquencies, criticized and classified loans all remained near historically low levels. *We will continue to support our clients while maintaining our moderate risk profile, which positions the company to perform well through all business cycles.*"

89. On February 22, 2023, the Company filed its Annual Report on Form 10-K for the year ended December 31, 2022 (the "2022 10-K"). The 2022 10-K was signed by all the Individual Defendants. Attached to the 2022 10-K was a SOX certification signed by Defendant Gorman attesting that the 2022 10-K fully complied with the requirements of Section 13(a) or 15(d) of the Exchange Act and that the information contained in the 2022 10-K fairly presented, in all material respects, the financial condition and results of operations of the Company.

90. The 2022 10-K contained similar statements as the 2019 10-K, 2020 10-K, and 2021 10-K concerning KeyCorp's management of its liquidity risks, its Contingency Funding Plan, and the monitoring of its liquidity position and funding sources. The Individual Defendants stated in the 2022 10-K that the Company's liquid asset portfolio was $35.5 billion: "The liquid

asset portfolio at December 31, 2022, totaled $35.5 billion, consisting of $33.2 billion of unpledged securities, $10 million of securities available for secured funding at the FHLB, and $2.4 billion of net balances of federal funds sold and balances in our Federal Reserve account."

## THE TRUTH EMERGES

91.     On March 6, 2023, KeyCorp filed a Current Report on Form 8-K attaching a presentation from the RBC Conference as an exhibit. In the presentation, KeyCorp provided updated NII guidance with only a 1%-4% increase in 2023 versus the previous guidance of a 6%-9% increase less than two months earlier. KeyCorp blamed this reduction in its 2023 guidance on "Deposit Beta and Funding Costs" because the "[m]arginal funding costs [were] increasing  with rising market interest rates" and impacted NII. The Company, however, reassured the public that there were numerous positive drivers on NII including "Organic Growth" from the Company's focus on "relationship banking" which was "driving loans and deposits." The Company also represented that its investment portfolio was still positioned "to provide liquidity and enhance returns while benefiting from higher reinvestment rates." KeyCorp emphasized its "Balance Sheet Positioning" which gave the Company the opportunity "to accelerate realization of value of short-term Treasuries" through the execution of "hedges to manage downside risk[.]"

92.     On March 13, 2023, following the collapse of several financial institutions including Silvergate Bank, Signature Bank, and Silicon Valley Bank, financial analysts downgraded KeyCorp's stock. For instance, Odeon Capital downgraded KeyCorp stock from Buy to Hold [2] and the S&P Global downgraded its bond ratings for Key Bank.[3]

---

[2] https://www.nasdaq.com/articles/odeon-capital-downgrades-keycorp-key

[3] https://finance.yahoo.com/news/sp-downgrades-show-some-regional-banks-still-face-rising-pressures-125611499.html

93.     On April 20, 2023, KeyCorp filed a Current Report on Form 8-K attaching a press release reporting on the Company's first quarter 2023 financial results. In the press release, KeyCorp continued to represent that the Company was positioned for stability from a "[d]urable relationship-based business model" and "[s]trong liquidity and funding, supported by diverse, core deposits[.]" In the press release, the Company discussed its disappointing NII results for the quarter, including a $121 million decrease in taxable-equivalent NII, stating in part:

> Taxable-equivalent [NII] was $1.1 billion for the first quarter of 2023 and the net interest margin was 2.47%.
>
> *          *          *
>
> Compared to the fourth quarter of 2022, taxable-equivalent [NII] decreased by $121 million, while the net interest margin decreased by 26 basis points. [NII] and the net interest margin reflect higher interest-bearing deposit costs and a change in funding mix, partly offset by higher earning asset balances and a benefit from higher interest rates. Additionally, [NII] was lower reflecting two fewer days in the first quarter of 2023.

94.     Also on April 20, 2023, KeyCorp held a conference call with financial analysts and investors to discuss the first quarter financial results. On the call, CFO Clark Khayat ("Khayat"), who replaced CFO Kimble on March 16, 2023, stated that the Company's NII in the second quarter of 2023 would only decrease by 4%-5%:

> As it relates to [NII], second quarter, *we'd expect that to be down kind of 4% to 5% in Q2* with NIM, NIM coming down in part because we're carrying a little bit excess liquidity post the early March period, and we would see that come down we think maybe another 6 to 8 basis points. And then as I responded to and Scott's question, kind of stabilize and start to come back up in the second half of the year.

95.     CFO Khayat also discussed the negative impact to the net interest margin from a change in liquidity and other factors, stating: "Relative to Q4, our net interest margin was negatively impacted by 22 basis points related to higher interest-bearing deposit costs and *22 basis points from a change in funding mix and liquidity and loan fees,* partly offset by 18 basis points related to higher interest rates and earning asset growth." Khayat reassured that the Company's

"liquidity position is strong, our period-end cash balances at the Federal Reserve stood at $8 billion, and we maintain flexibility with significant levels of unused borrowing capacity from additional sources."

96. However, on June 12, 2023, at the Morgan Stanley US Financials, Payments, & CRE Conference, CFO Khayat revealed that KeyCorp anticipated that the third quarter of 2023 NII would be weaker than expected, "based on funding mix and deposit cost pressures." Khayat cautioned that the NII would probably drop 12% in the second quarter compared to the earlier projection of 4%-5% less than two months earlier. Further, Defendant Gorman disclosed that KeyBank clients were demanding higher interest rates on their deposits, and KeyBank would likely face higher capital and liquidity requirements by regulators, adding: "We're paying very close attention to our RWAs [risk-weighted assets] because we don't know how this is going to play out[.]"

97. On the news of the further revised negative guidance, KeyCorp's stock price fell $0.46 per share, or 4.31% to close at $10.22 per share on June 12, 2023. In total, the Company's stock fell more than 45% since analysts originally downgrade of KeyCorp's securities on March 13, 2023.

**2023 PROXY STATEMENT**

98. On March 24, 2023, the Company filed its 2023 Proxy Statement with the SEC soliciting shareholder votes to, among other things, re-elect the Individual Defendants to the Board, approve executive compensation, and approve the KeyCorp Amended and Restated 2019 Equity Compensation Plan. The Board authorized the 2023 Proxy Statement and included a message to shareholders signed by Defendant Gorman.

99. The 2023 Proxy Statement represented that KeyCorp is committed to high

standards of corporate governance, stating in part:

> We believe the best way to deliver long-term value is by delivering on our commitments to every stakeholder we serve – our shareholders, clients, colleagues, regulators, and communities. At Key, environmental, social, and governance ("ESG") is central to who we are and how we do business – we are here to help our clients and communities thrive – and through these efforts, we create outstanding results for our shareholders.

*     *     *

> We are committed to meeting high standards of ethical behavior, corporate governance, and business conduct.

100.    The 2023 Proxy Statement represented that the Board oversees and monitors the

Company's risk exposures, stating in part:

> Our Board structure enables the Board to exercise vigorous oversight of key issues relating to management development, succession and compensation, compliance and integrity, corporate governance and ESG, cybersecurity, and company strategy and risk. With respect to risk, the Board oversees that KeyCorp's risks are managed in a manner that is effective and balanced and adds value for KeyCorp's shareholders. The Board understands KeyCorp's risk philosophy, approves KeyCorp's risk appetite, inquires about risk practices, reviews the portfolio of risks, compares actual risks to the risk appetite, and is apprised of significant risks, both current and emerging, and determines whether management is responding appropriately. With respect to risk and other areas that it oversees, the Board challenges management and promotes accountability.

101.    The 2023 Proxy Statement represented that the Audit Committee is engaged in

vigorous oversight over risks to the Company, the adequacy of the Company's internal controls,

and compliance with all legal requirements, stating in part: "The Audit Committee has primary

oversight responsibility for internal audit, financial reporting, legal matters, and fraud risk."

102.    The 2023 Proxy Statement represented that the Risk Committee assists the Board

"with strategies, policies, procedures, and practices relating to the assessment and management of

KeyCorp's enterprise-wide risks, including credit risk, market risk, ***liquidity risk***, compliance risk,

operational risk…and other risks…."

103.    The foregoing statements in the 2023 Proxy Statement were false and misleading

28

and omitted material information. Contrary to the representations made in the 2023 Proxy Statement, the Board was required, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing KeyCorp's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

104.    On May 12, 2023, KeyCorp filed a Current Report on Form 8-K announcing, among other things, that pursuant to the solicitations in the 2023 Proxy Statement, the Individual Defendants were re-elected to the Board and the executive compensation and the KeyCorp Amended and Restated 2019 Equity Compensation Plan were both approved.

## DAMAGES TO KEYCORP

105.    As a direct and proximate result of the Individual Defendants' conduct, KeyCorp has expended and will continue to expend significant sums of money.

106.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

107.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

108.    As a direct and proximate result of the Individual Defendants' conduct, KeyCorp has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount"

that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

109.    Plaintiff brings this action derivatively and for the benefit of KeyCorp to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and officers of KeyCorp and violations of Section 14(a) of the Exchange Act, and to seek contribution for violations of Section 21D of the Exchange Act, as well as the aiding and abetting thereof. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

110.    Plaintiff is, and has been at all relevant times, a stockholder of KeyCorp and was a stockholder of the Company at the time of the misconduct alleged herein. Plaintiff will adequately and fairly represent the interests of KeyCorp in enforcing and prosecuting its rights.

111.    A pre-suit demand on the Board is futile, and therefore, excused. At the time of filing this action, KeyCorp's Board consists of the following thirteen Individual Defendants: Gorman, Cutler, Dallas, Gile, Gillis, Hayes, Highsmith, Hipple, Rankin, Snyder, Tobin, Vasos, and Wilson. Plaintiff needs only to allege demand futility as to seven of the thirteen directors that are on the Board at the time this action is commenced.

112.    Demand is excused as to all of the Individual Defendants as each of them faces, individually and collectively, a substantial likelihood of liability as they made and/or caused the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of wrongdoing.

113.    Defendant Gorman has served as Chairman of the Board and CEO of KeyCorp

30

since May 2020 and has been employed by the Company for twenty-five years. Gorman therefore is not independent.  The 2023 Proxy Statement admits that Gorman is not independent. As an employee of KeyCorp, the Company provides Defendant Gorman with his principal occupation from which he receives substantial compensation, as detailed above.  Thus, Gorman could not consider a demand for action that might require him to sue the directors who control his continued employment or fellow members of management with whom he works on a day-to-day basis.

114.    Gorman is named as a defendant in the pending Securities Class Action.  As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

115.    Defendants Gorman and Rankin have a business relationship which precludes them from acting in an independent and disinterested manner. Gorman is the CEO of Key Venture Partners LLC ("Key Venture"), a venture capital firm that invests in software, communications, information services, and information technology sectors. Defendant Rankin is the CFO of Key Venture.

116.    Defendants Gorman and Cutler likewise have a business relationship which precludes them from acting in an independent and disinterested manner. Both have served in leadership positions on the Ohio Business Roundtable, with Gorman serving as the current Vice Chair.

117.    Gorman signed a message to shareholders included in the 2023 Proxy Statement. The 2023 Proxy Statement contained false and misleading statements and material omissions and faces a substantial likelihood of liability therefor. In addition, Gorman benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the KeyCorp Board through the false and misleading statements and material omissions in the 2023 Proxy

31

Statement.

118.     Further, as a Company director, Gorman conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Gorman breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Gorman is futile and excused.

119.     Defendants Cutler and Gorman have a business relationship which precludes them from acting in an independent and disinterested manner. Both have served in leadership positions on the Ohio Business Roundtable, with Gorman serving as the current Vice Chair.

120.     Defendant Cutler authorized the 2023 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor. In addition, Cutler benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the KeyCorp Board through the false and misleading statements and material omissions in the 2023 Proxy Statement.

121.     Cutler, as a member of the Nominating and Corporate Governance Committee, had the duty, among others, to ensure the implementation and effectiveness of KeyCorp's Corporate Governance Principles. Cutler utterly failed to perform these duties.

122.     Further, as a Company director, Cutler conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Cutler breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor

disinterested. Thus, demand upon Cutler is futile and excused.

123. Defendant Dallas authorized the 2023 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor. In addition, Dallas benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the KeyCorp Board through the false and misleading statements and material omissions in the 2023 Proxy Statement.

124. Dallas, as a member of the Audit Committee, had duties regarding oversight of the risks facing the Company and KeyCorp's compliance with relevant laws, rules, and regulations. Dallas utterly failed to perform these essential duties.

125. Dallas, as Chair of the Nominating and Corporate Governance Committee, had the duty, among others, to ensure the implementation and effectiveness of KeyCorp's Corporate Governance Principles. Dallas utterly failed to perform these duties.

126. Further, as a Company director, Dallas conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Dallas breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Dallas is futile and excused.

127. Defendant Gile authorized the 2023 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor. In addition, Gile benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the KeyCorp Board through the false and misleading statements and material omissions in the 2023 Proxy Statement.

33

128.     Gile, as Chair of the Risk Committee, had duties regarding oversight of the Company's overall risk framework, and was responsible for identifying, measuring, monitoring, and controlling the key risks facing the Company.  Gile utterly failed to perform these essential duties.

129.     Gile, as a member of the Nominating and Corporate Governance Committee, had the duty, among others, to ensure the implementation and effectiveness of KeyCorp's Corporate Governance Principles. Gile utterly failed to perform these duties.

130.     Further, as a Company director, Gile conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. As a result, Gile breached her fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Gile is futile and excused.

131.     Defendant Gillis authorized the 2023 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor. In addition, Gillis benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the KeyCorp Board through the false and misleading statements and material omissions in the 2023 Proxy Statement.

132.     Gillis, as a member of the Audit Committee, had duties regarding oversight of the risks facing the Company and KeyCorp's compliance with relevant laws, rules, and regulations. Gillis utterly failed to perform these essential duties.

133.     Further, as a Company director, Gillis conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously

disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. As a result, Gillis breached her fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Gillis is futile and excused.

134.    Defendant Hayes authorized the 2023 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor. In addition, Hayes benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the KeyCorp Board through the false and misleading statements and material omissions in the 2023 Proxy Statement.

135.    Hayes, as a member of the Risk Committee, had duties regarding oversight of the Company's overall risk framework, and was responsible for identifying, measuring, monitoring, and controlling the key risks facing the Company.  Hayes utterly failed to perform these essential duties.

136.    Further, as a Company director, Hayes conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Hayes breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Hayes is futile and excused.

137.    Defendant Highsmith authorized the 2023 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor. In addition,  Highsmith benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the KeyCorp Board through the false and misleading

statements and material omissions in the 2023 Proxy Statement.

138.    Defendant Highsmith, as a member of the Risk Committee, had duties regarding oversight of the Company's overall risk framework, and was responsible for identifying, measuring, monitoring, and controlling the key risks facing the Company. Highsmith utterly failed to perform these essential duties.

139.    Highsmith, as a member of the Nominating and Corporate Governance Committee, had the duty, among others, to ensure the implementation and effectiveness of KeyCorp's Corporate Governance Principles. Highsmith utterly failed to perform these duties.

140.    Further, as a Company director, Highsmith conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Highsmith breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Highsmith is futile and excused.

141.    Defendant Hipple authorized the 2023 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor. In addition, Hipple benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the KeyCorp Board through the false and misleading statements and material omissions in the 2023 Proxy Statement.

142.    Hipple, as Chair of the Audit Committee, had duties regarding oversight of the risks facing the Company and KeyCorp's compliance with relevant laws, rules, and regulations. Hipple utterly failed to perform these essential duties.

143.    Hipple, as a member of the Nominating and Corporate Governance Committee, had

the duty, among others, to ensure the implementation and effectiveness of KeyCorp's Corporate Governance Principles. Hipple utterly failed to perform these duties.

144.    Further, as a Company director, Hipple conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Hipple breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Hipple is futile and excused.

145.    Defendant Rankin authorized the 2023 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor. In addition, Rankin benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the KeyCorp Board through the false and misleading statements and material omissions in the 2023 Proxy Statement.

146.    Rankin, as a member of the Audit Committee, had duties regarding oversight of the risks facing the Company and KeyCorp's compliance with relevant laws, rules, and regulations. Rankin utterly failed to perform these essential duties.

147.    Further, as a Company director, Rankin conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. As a result, Rankin breached her fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Rankin is futile and excused.

148.    Defendants Rankin and Gorman have a business relationship which precludes them

from acting in an independent and disinterested manner. Defendant Rankin is the CFO of Key Venture, a venture capital firm. Gorman is the CEO of Key Venture.

149.    Defendant Snyder authorized the 2023 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor. In addition, Snyder benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the KeyCorp Board through the false and misleading statements and material omissions in the 2023 Proxy Statement.

150.    Snyder, as a member of the Nominating and Corporate Governance Committee, had the duty, among others, to ensure the implementation and effectiveness of KeyCorp's Corporate Governance Principles. Snyder utterly failed to perform these duties.

151.    Further, as a Company director, Snyder conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. As a result, Snyder breached her fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Snyder is futile and excused.

152.    Defendant Tobin authorized the 2023 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor. In addition, Tobin benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the KeyCorp Board through the false and misleading statements and material omissions in the 2023 Proxy Statement.

153.    Further, as a Company director, Tobin conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously

disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Tobin breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Tobin is futile and excused.

154.    Defendant Vasos authorized the 2023 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor. Vasos benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the KeyCorp Board through the false and misleading statements and material omissions in the 2023 Proxy Statement.

155.    Further, as a Company director, Vasos conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Vasos breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Vasos is futile and excused.

156.    Defendant Wilson authorized the 2023 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor. In addition, Wilson benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the KeyCorp Board through the false and misleading statements and material omissions in the 2023 Proxy Statement.

157.    Wilson, as a member of the Risk Committee, had duties regarding oversight of the Company's overall risk framework, and was responsible for identifying, measuring, monitoring, and controlling the key risks facing the Company. Wilson utterly failed to perform these essential

duties.

158.     Further, as a Company director, Wilson conducted little, if any, oversight of the scheme that caused the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Wilson breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Wilson is futile and excused.

159.     KeyCorp has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

160.     The Individual Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

161.     Publicly traded companies, such as KeyCorp, normally carry director and officer liability insurance from which the Company could potentially recover some or all its losses. Such insurance typically, however, contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover KeyCorp's damages.

### COUNT I
**Against the Individual Defendants for**
**Violations of Section 14(A) of the Exchange Act**

162.     Plaintiff incorporates by reference and realleges each and every allegation set forth

above as if fully set forth herein.

163.    The Section 14(a) claim alleged herein is based solely on negligence.  It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. Section 14(a) claim alleged herein does not allege and does not sound in fraud. Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to, any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

164.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

165.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

166.    Under the direction and watch of the Individual Defendants, the 2023 Proxy Statement failed to disclose that the Individual Defendants each violated their fiduciary duties to KeyCorp and its stockholders by, among other things, failing to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing KeyCorp's core operations and making truthful, accurate, and

complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Further, the 2023 Proxy Statement contained false and misleading statements related to risk oversight by the Board and the Company's commitment to strong corporate governance principles.

167.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading and omitted material information.

168.    The false and misleading statements in, and information omitted from, the 2023 Proxy Statement was material to KeyCorp's shareholders in determining whether to, among other things, elect the Individual Defendants to the Board, approve executive compensation, and approve the KeyCorp Amended and Restated 2019 Equity Compensation Plan.

169.    The material misstatements and omissions in the 2023 Proxy Statement damaged the Company.

170.    Plaintiff, on behalf of KeyCorp, seeks relief for damages inflicted upon the Company based on the misleading 2023 Proxy Statement in connection with the improper election of the Individual Defendants, the approval of executive compensation, and the approval of the KeyCorp Amended and Restated 2019 Equity Compensation Plan.

## COUNT II
### Against the Individual Defendants for Breach of Fiduciary Duties

171.    Plaintiff incorporates by reference and realleges each allegation contained above, as though fully set forth herein.

172.    The Individual Defendants owed and owe fiduciary duties to KeyCorp.  By reason

of their fiduciary relationships, the Individual Defendants specifically owed and owe KeyCorp the highest obligation of good faith and loyalty in the administration of KeyCorp's affairs.  The Board also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to KeyCorp alleged herein.

173.    The Individual Defendants ignored their obligations under state and federal law. The Individual Defendants failed to make a good faith effort to correct the problems or prevent their recurrence.

174.    The Individual Defendants each violated their fiduciary duties to KeyCorp and its stockholders by, among other things, failing to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing KeyCorp's core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, KeyCorp has sustained and continues to sustain significant damages and its reputation has been irreparably damaged.

175.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.  Plaintiff on behalf of KeyCorp has no adequate remedy at law.

**COUNT III**

**Against the Individual Defendants for Contribution for
Violations of 21D of the Exchange Act**

176.    The conduct of the Individual Defendants, as described herein, has exposed the

Company to significant liability under various federal securities laws by their misconduct.

177.    KeyCorp is named as a defendant in a related securities class action lawsuit that alleges and asserts claims arising under the federal securities laws.  The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein.

178.    If KeyCorp is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the misconduct of all or some of the Individual Defendants as alleged herein, who have caused the Company to suffer substantial harm through their misconduct.  The Company is entitled to contribution and indemnification from the Individual Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

179.    As officers and directors, the Individual Defendants had the power or ability to, and did, control or influence, either directly or indirectly, KeyCorp's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

180.    The Individual Defendants are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

181.    The Individual Defendants have damaged the Company and are liable to the Company for contribution.

## <u>COUNT IV</u>
### Against the Individual Defendants for Aiding and Abetting

182.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

183.    Each of the Individual Defendants has acted and is acting with knowledge of or

with reckless, or grossly negligent, disregard to the fact that the Individual Defendants are in breach of their duties to the Company and have participated in such breaches of duties.

184.     In committing the wrongful acts, each of the Individual Defendants has pursued or joined in the pursuit of a common course of conduct. They have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

185.     Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

186.     Each of the Individual Defendants aided and abetted each other and rendered substantial assistance in the wrongs complained of herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of KeyCorp and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants violated Section 14(a) and Section 21D of the Exchange Act;

(c)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to KeyCorp;

(e)     Directing the Company to take all necessary actions to reform and improve its internal controls and Board oversight;

(f)     Determining and awarding to KeyCorp the damages sustained by it as a result of

the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(g)      Ordering disgorgement of profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties;

(h)      Awarding KeyCorp restitution from the Individual Defendants, and each of them;

(i)       Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(j)       Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: December 19, 2023

Respectfully submitted,

**KARON LLC**

*/s/Daniel Karon*
Daniel Karon (0069304)
700 W. St. Clair Ave., Ste. 200,
Cleveland, Ohio 44113
Telephone: (216) 622-1851
Email: dkaron@karonllc.com

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
Erica L. Stone
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com
Email: estone@rosenlegal.com

*Counsel for Plaintiff*

46